United States District Court
Middle District of Florida
Tampa Division

**MARIE PRATHER, ON BEHALF OF M.C.,**

***Plaintiff,***

**V.** **NO. 8:16-CV-110-T-PDB**

**COMMISSIONER OF SOCIAL SECURITY,**

***Defendant.***

---

## Order Affirming Commissioner's Decision

This is a case under 42 U.S.C. § 1383(c)(3) to review a final decision of the Commissioner of the Social Security Administration ("SSA") denying Marie Prather's claim on behalf of her minor son, M.C., for supplemental security income.[1] She seeks reversal, Doc. 24; the Commissioner, affirmance, Doc. 25. This order adopts the summaries of facts and law in the Administrative Law Judge's ("ALJ's") decision, Tr. 10–23, and in the parties' briefs, Docs. 24, 25.

[1]The SSA uses an administrative review process a claimant ordinarily must follow to receive benefits or judicial review of their denial. *Bowen v. City of New York*, 476 U.S. 467, 471−72 (1986). A state agency acting under the Commissioner's authority makes an initial determination. 20 C.F.R. §§ 416.1400–416.1406. If the claimant is dissatisfied with the initial determination, she may ask for reconsideration. 20 C.F.R. §§ 416.1407−416.1422. If she is dissatisfied with the reconsideration determination, she may ask for a hearing before an Administrative Law Judge ("ALJ"). 20 C.F.R. §§ 416.1429−416.1443. If she is dissatisfied with the ALJ's decision, she may ask for review by the Appeals Council. 20 C.F.R. §§ 416.1467−416.1482. If the Appeals Council denies review, she may file an action in federal district court. 20 C.F.R. § 416.1481. Section 1383(c)(3), incorporating 42 U.S.C. § 405(g), provides the basis for the court's jurisdiction.

## I. Issues

Prather presents three issues: (1) whether substantial evidence supports the ALJ's finding M.C. has no impairment or combination of impairments that functionally equals an impairment in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1; (2) whether the ALJ properly evaluated Prather's testimony; and (3) whether the ALJ properly evaluated M.C.'s subjective complaints. Doc. 24 at 3, 10–16.

## II. Background

M.C. was born in 1997 and was an adolescent at all relevant times. Tr. 127; *see* 20 C.F.R. § 416.926a(g)(1)(v)[2] (defining adolescent as "age 12 to attainment of age 18"). In April 2012, Prather applied for supplemental security income on M.C.'s behalf, alleging M.C. has been disabled since October 2011[3] due to juvenile rheumatoid arthritis, Sjögren's syndrome,[4] and asthma. Tr. 127, 159. She proceeded through the administrative process, failing at each level. Tr. 1–6, 10–23, 41–59, 61–67, 73–79. This case followed. Doc. 1.

---

[2]Unless otherwise stated, all citations are to the regulations in effect on the date of the ALJ's decision.

[3]Because the SSA will not pay supplemental security income for the month in which a claimant files an application or for any month before that, the pertinent time period for determining whether a claimant is disabled begins on the application date. *See* 20 C.F.R. § 416.335.

[4]Sjögren's syndrome is a disease often associated with rheumatoid arthritis and characterized by dry eyes, dryness of mucous membranes, dilation of blood vessels or spots on the face caused by hemorrhages into the skin, and enlargement of parotid glands. STEDMAN'S MEDICAL DICTIONARY 821, 1537 (William R. Hensyl et al. eds., 25th ed. 1990).

## III. Evidence

### *A. Medical Evidence*

In April 2011, M.C. reported to his primary care physician, Dr. Amanda Puentes, that his knees had been giving out during physical-education classes and he had been experiencing pain in his wrists, ankles, and knees for more than a year. Tr. 303. She advised him to take ibuprofen as needed and apply heat. Tr. 304.

In August 2011, M.C. returned to Dr. Puentes complaining of right-shoulder pain. Tr. 301. She ordered an MRI of the shoulder and recommended ibuprofen and alternating heat and ice after school and after using the shoulder. Tr. 301–02.

In October 2011, M.C. saw Dr. Drew Warnick for evaluation of a right-shoulder injury he had sustained a few months earlier when trying to open a cattle gate. Tr. 314–16. Dr. Warnick observed he had "full pain-free range of motion of the" shoulder, full rotation strength, nearly full abduction strength, and "slight discomfort with the empty drawer test." Tr. 315. Dr. Warnick observed no swelling of other joints and slight tenderness of the left ankle. Tr. 315. He opined M.C. had synovitis in the right shoulder with no tear and "stressed the importance of him seeing a rheumatologist to be placed on appropriate medication" for arthritis. Tr. 315.

In October 2011, M.C. saw Dr. Robert Nickeson for evaluation for possible arthritis. Tr. 434–35. Dr. Nickeson observed he had mild swelling in the knees, joint hypermobility,[5] and his small hand joints were unremarkable. Tr. 435. He started him on piroxicam. Tr. 435.

---

[5]Joint hypermobility refers to an "[i]ncreased range of movement of joints, joint laxity, occurring normally in young children or as a result of disease." STEDMAN'S MEDICAL DICTIONARY 742 (William R. Hensyl et al. eds., 25th ed. 1990).

In December 2011, M.C. returned to Dr. Nickeson complaining of occasional dry eyes and joint pain about two days a week. Tr. 433. Dr. Nickeson observed his shoulder seemed to be a particular problem and his hand and leg joints did not show significant swelling. Tr. 433. A few days later, Dr. Nickeson contacted another doctor about performing a lip biopsy to test for Sjögren's syndrome. Tr. 286.

In February 2012, M.C. returned to Dr. Puentes complaining of ongoing joint pain "due to baseball and FHA activities." Tr. 295. Dr. Puentes noted Prather reported M.C.'s arthritis causes him to be tardy on days when he needs to take longer showers to relieve pain. Tr. 295. Dr. Puentes provided a note indicating M.C. should be allowed to be tardy "at most 2 times a week due to flare up of joint pain." Tr. 296. She encouraged Prather to call any time M.C. would be tardy so they could keep a record of the frequency. Tr. 296.

In February 2012, M.C. returned to Dr. Warnick and stated "his shoulder has completely resolved, [but] he has developed right knee, right hip, and right ankle pain." Tr. 311. Dr. Warnick observed M.C. had started baseball within the previous two weeks, "which seemed to exacerbate this pain." Tr. 311. He observed mild tenderness to palpation but normal gait. Tr. 311. He stated, "The treatment for [M.C.'s] knee, hip, and ankle are stretching and strengthening exercises" and advised M.C. to continue taking medication as prescribed. Tr. 312.

About twice a week from February to April 2012 and again a few times in May 2012, M.C. participated in physical therapy. Tr. 320–69.

In October 2012, M.C. returned to Dr. Nickeson complaining of continuing joint pain. Tr. 423–24. Dr. Nickeson observed no problems in M.C.'s arms and "2-plus" swelling in his ankles, and he advised him to continue taking prednisone at the current dose for another three to four weeks and reduce the dose after that. Tr. 423.

In January 2013, M.C. returned to Dr. Nickeson. Tr. 421. Dr. Nickeson observed he continued to experience ankle, knee, and wrist swelling, had been playing "a

number of instruments, including piano, guitar, sax[ophone], and ukulele," was teaching computer skills to other people, wanted to play more baseball, and was intermittently participating in homebound education. Tr. 421. He observed M.C.'s arthritis was not responding well to current medication, so he introduced weekly methotrexate injections. Tr. 421.

In September 2013, M.C. returned to Dr. Nickeson and reported "feeling better with methotrexate" and having more pep. Tr. 419. Dr. Nickeson observed he had been playing baseball with friends, enjoyed being in the outfield, and intended to practice pitching. Tr. 419. He observed swelling in the elbows, small hand joints, ankles, and right knee. Tr. 419. He concluded, "[M.C.] is doing well with methotrexate. I think we could push the dose higher, due to his size." Tr. 419.

In December 2013, M.C. returned to Dr. Nickeson. Tr. 415. Dr. Nickeson observed, "Energy is good and is increased with slight raising of his methotrexate dose. He is playing baseball and is more active. He is down 15 pounds from last year with increase in activity. He is not complaining of nausea." Tr. 415. He concluded, "Assessment is good arthritis control." Tr. 415. He reduced the prednisone dose and left the methotrexate dose unchanged. Tr. 415.

In April 2014, M.C. returned to Dr. Nickeson reporting his right shoulder (his "biggest problem" since October 2013) had improved over the previous month. Tr. 417. Dr. Nickeson observed M.C. had been off methotrexate around that time because Prather had had difficulty keeping up with refills due to a combination of transportation and insurance problems. Tr. 417. At the time of examination, he was taking prednisone daily, methotrexate weekly, and Tylenol as needed. Tr. 417. Dr. Nickeson observed he had limited range of motion of the right shoulder but could "extend both arms over his head pretty well." Tr. 417. A joint exam showed "no particular problems except for [mild] swelling in the right wrist" and swelling in the knees and ankles. Tr. 417. He maintained M.C. on the same methotrexate dose and reduced the prednisone dose. Tr. 418.

### *B. Opinion Evidence*

In June 2012, Pauline Correia, M.C.'s eighth-grade exceptional student education ("ESE") teacher for math and language arts, completed a questionnaire. Tr. 165–67. She stated she sees him twice each school day, and he is on grade level for reading, math, and written language. Tr. 165. She stated he has an unusual absenteeism "[d]ue to his illness—Sjogrens' [sic]; migraine headaches[;] arthritis." Tr. 165.

For the domain of acquiring and using information, Ms. Correia opined M.C. has an obvious problem expressing ideas in written form, stating, "Due to stiffness in joints, difficulty holding writing instruments." Tr. 166.

For the domain of attending and completing tasks, Ms. Correia opined M.C. has obvious problems weekly with completing class or homework assignments and working at a reasonable pace and finishing on time. Tr. 167. She stated, "The student is independent, however, due to physical difficulties, [he] cannot write at an excellerated [sic] pace and in a large amount for his grade level. For ex: can barely write 3 full sentences during written assignments." Tr. 167.

For the domain of moving about and manipulating objects, Ms. Correia opined M.C. has obvious problems moving his body from one place to another and managing the pace of physical activities or tasks. Tr. 169. She stated, "Dexterity is minimal when grasping a pencil to write. Due to arthritis, kneeling, sitting for long periods, standing, and crouching are painful activities." Tr. 169.

Ms. Correia opined M.C. has no observed problems in the domains of interacting and relating with others and caring for himself. Tr. 168, 170.

For the domain of health and physical well-being, in response to the question asking her to describe "any chronic or episodic condition" and whether its physical effects interfere with his functioning, she responded, "none seen at school." Tr. 171.

She stated M.C. "has morning stiffness causing severe difficulties in moving with pain. There may be some mornings when he arrives tardy as a result. Very unpredictable and unavoidable physical state." Tr. 171.

Later in June 2012, state-agency medical consultant Dr. Edith Davis opined M.C. has severe impairments of inflammatory arthritis, Sjögren's syndrome, and asthma. Tr. 44. She opined he has less-than-marked limitations in the domains of moving about and manipulating objects and health and physical well-being, and no limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for himself. Tr. 44–45. Regarding moving about and manipulating objects, she stated, "There may be limitations due to painful joints. Teacher Questionnaire: difficulty writing at a fast pace." Tr. 45. On health and physical well-being, she stated:

> 14 yr old boy with dx of JRA, Sj[ö]gren's Syndrome. Sinding-larsen-johnson syndrome of rt knee. Bursitis of rt hip & rt ankle stain [sic]. Responding to present treatment. OrthoPedic OV: 2/24/12: Rt shoulder pain resolved[.] Has rt knee, rt hip, & rt [ankle] pain. PE: Tenderness over inferior pole of patell [sic] & tendon. Mildly tenderness [sic] on rt trochanter. Tenderness of anterior talofibular lig[a]ment. Nl gait. No joint effusion. X-Ray of pelvis: WNL. Plan: Strengthening exercises. f/u PRN.
>
> 12/9/11 Rhe[u]matology OV: Has dry eyes, not daily. Has tear production. Joint pains about 2 days a week. Wt 111kg@>97%. Ht 175cm @ 50%. PE: Joint[s] are not showing a lot of swelling in hand or lower extremities. Less than marked.

Tr. 45.

In October 2012, state-agency medical consultant Dr. Shakra Junejo found the same severe impairments and limitations in the functional domains. Tr. 54–55. For the domain of health and physical well-being, besides the evidence Dr. Davis cited, she cited new evidence from August and September 2012 concerning reports of chest pain. Tr. 55.

In April 2014, Susan Noblitt, M.C.'s homebound language-arts teacher, completed a questionnaire. Tr. 272–79. She stated she has known him for 13 months and sees him once a week. Tr. 272. She marked he has no observed problems in the domain of acquiring and using information, but in the narrative section, she stated, "Because of his health issues, he is unable to function socially with his peer group. What few activities he does are with his family." Tr. 273.

For the domain of attending and completing tasks, Ms. Noblitt opined M.C. has no problem refocusing to a task when necessary, carrying out single-step instructions, waiting to take turns, changing from one activity to another without being disruptive, organizing his own things or school materials, completing work accurately without careless mistakes, and working without distracting himself or others; slight problems paying attention when spoken to directly and carrying out multi-step instructions; an obvious problem completing class or homework assignments; and very serious problems sustaining attention during play or sports activities, focusing long enough to finish assigned activities or tasks, and working at a reasonable pace and finishing on time. Tr. 274. She stated, "He is unable to complete assignments in a timely manor [sic]. I meet with him once a week and most of the time he's not completed homework. Many times we have to reschedule because he is ill." Tr. 274.

For the domain of interacting and relating with others, Ms. Noblitt opined M.C. has no problem seeking attention and asking permission appropriately, following rules, respecting and obeying adults in authority, using language appropriate to the situation and listener, introducing and maintaining relevant and appropriate topics of conversation, taking turns in a conversation, and interpreting the meaning of facial expressions, body language, hints, and sarcasm; slight problems playing cooperatively with other children, expressing anger appropriately, relating experiences and telling stories, and using adequate vocabulary and grammar to express thoughts and ideas in general, everyday conversation; and a serious problem making and keeping friends. Tr. 275. She stated, "[M.C.]'s mom is very supportive!

She appears to be willing to create as typical a teenage life as he wishes and can physically handle. He doesn't always/if rarely is physically able." Tr. 275.

For the domain of moving about and manipulating objects, Ms. Noblitt opined M.C. has a slight problem planning, remembering, and executing controlled motor movements; obvious problems showing a sense of his body's location and movement in space and integrating sensory input with motor output; and very serious problems moving from one place to another, moving and manipulating things, demonstrating strength, coordination, and dexterity in activities or tasks, and managing the pace of physical activities or tasks. Tr. 276. She stated, "He is in constent [sic] pain and does the best he can but I can tell when he does [sic] feel well." Tr. 276.

For the domain of caring for himself, Ms. Noblitt opined M.C. has no problem being patient when necessary, using good judgment regarding personal safety and dangerous circumstances, and knowing when to ask for help; slight problems handling frustration appropriately, taking care of personal hygiene, caring for physical needs such as dressing and eating, and responding appropriately to changes in his mood; an obvious problem identifying and appropriately asserting his emotional needs; and a very serious problem using appropriate coping skills to meet the daily demands of a school environment. Tr. 277. She stated, "[M.C.] isn't physically able to attend a normal schedule school [sic]. The more he's not on a regular schedule the harder it is to return." Tr. 277.

For the domain of health and physical well-being, Ms. Noblitt identified "physical pain, depression[,] and antisocial behavior" as M.C.'s chronic or episodic conditions. Tr. 278. She stated he uses glasses and an inhaler and needs but has no assistive technology device. Tr. 278. She stated he takes medication regularly, which affects his functioning, but she did not describe how. Tr. 278. In response to the question, "Does this child frequently miss school due to illness?," she responded "DOESN'T ATTEND!! HOMEBOUND!!" Tr. 278 (emphasis in original).

Also in April 2014, the head of the ESE department at M.C.'s school (whose signature is illegible) completed a questionnaire about M.C.'s functioning. Tr. 264–71. She stated she had known him for two years, he was homebound for all subjects, and "many medical and health issues prevent [him] from attending" school. Tr. 264.

For the domain of acquiring and using information, the department head opined M.C. has no problems comprehending oral instructions, understanding school and content vocabulary, reading and comprehending written material, providing organized oral explanations and adequate descriptions, learning new material, and recalling and applying previously learned material; a slight problem comprehending and doing math problems; an obvious problem expressing ideas in writing; and very serious problems understanding and participating in class discussions and applying problem-solving skills in class discussions. Tr. 265. She clarified: "Due to student[']s health issues it interferes with scheduled homebound visits and prevents student from completing assignments as scheduled"; "participation and classroom discussions—he is unable to attend with other students for discussion for over 4 years"; he "struggles with writing the material due to health issues"; and he "cannot participate in class discussion with other students[,] for he does not attend due to health issues." Tr. 265.

For the domain of attending and completing tasks, the department head opined M.C. has no problem paying attention when spoken to directly, refocusing to tasks when necessary, carrying out instructions, waiting to take turns, changing from one activity to another without being disruptive, completing work accurately without careless mistakes, working without distracting himself or others, and working at a reasonable pace and finishing on time; an obvious problem organizing his own things or school materials; serious problems focusing long enough to finish an assigned activity or task and completing class or homework assignments; and a very serious problem sustaining attention during play or sports activities. Tr. 266. She clarified:

"due to health issues[, he] cannot participate" in play or sports, and whether he has serious problems focusing depends on how he feels during the assignment. Tr. 266.

The department head opined M.C. has problems in the domain of interacting and relating with others, but she did not describe the degree of his difficulties in specific activities because, "due to health issues[,] M.C. does not attend school to be around other students. [He] [d]oes not have any social interaction with other students." Tr. 267.

For the domain of moving about and manipulating objects, the department head opined M.C. has a slight problem integrating sensory input with motor output; obvious problems demonstrating strength, coordination, and dexterity in activities or tasks and planning, remembering, and executing controlled motor movements; a serious problem managing the pace of physical activities or tasks; and very serious problems moving from one place to another and moving and manipulating things. Tr. 268. She stated, "[A]ll of these activities will be documented through medical diagnosis." Tr. 268.

For the domain of caring for himself, the department head opined M.C. has no problems handling frustration appropriately, being patient when necessary, caring for his physical needs, and using good judgment regarding personal safety and dangerous circumstances; obvious problems taking care of personal hygiene and cooperating in or being responsible for taking needed medications; and serious problems identifying and appropriately asserting emotional needs, responding appropriately to changes in his mood, and knowing when to ask for help. Tr. 269. She clarified: "[M.C.] is dealing with a lot of pain due to medical issues which causes him to not care." Tr. 269.

For the domain of health and physical well-being, the department head stated M.C. has "many medical issues"; uses glasses, an inhaler, and an assistive technology device; and "has not attended school since 7th grade due to medical issues." Tr. 270.

### *C. Hearing Testimony*

At an April 2014, hearing, Prather testified as follows.

M.C. "struggles day-to-day to get out of bed" and goes from the bed to the couch, although some days he cannot get out of bed. Tr. 33–34. He is 5'11" and weighs about 240 pounds. Tr. 33. He was diagnosed with juvenile rheumatoid arthritis when he was in the sixth grade but has "been sick since birth." Tr. 34. He receives homebound education. Tr. 34. He cannot participate some days depending on how he feels. Tr. 34. He takes medication while in bed. Tr. 34. It makes him sick sometimes. Tr. 34–35. The "chemo shots"[6] also make him sick. Tr. 35.

Due to pain, M.C. cannot focus and is "in tears in bed." Tr. 35. He gets tired or sick from medication, "especially from the chemo shots," which make him sick several days a week. Tr. 35. His symptoms seem to stay the same or get worse. Tr. 35.

He is in ninth grade but should be in tenth grade. Tr. 35. The 2013-to-2014 school year was his first participating in homebound schooling fulltime. Tr. 35. Dr. Nickeson recommended homebound schooling. Tr. 36. Beginning in elementary school and continuing through middle school, Prather must sometimes pick him up early or take him to school late "because it takes him so long to be able to even get going throughout the day." Tr. 36. His grades have improved since one-on-one instruction. Tr. 36. Sometimes he takes a long time to do school work because he cannot focus or is in pain. Tr. 36. Sometimes he has to put work aside and return to it when he feels better, but even then "he may only be able to do a little bit and then come back to it and do a little bit, and sometimes he doesn't even get to complete the assignments." Tr. 36–37.

---

[6]Prather testified M.C. receives "chemo shots" to treat arthritis. Tr. 35. The Court understands that to be a reference to methotrexate injections M.C. receives weekly as prescribed by Dr. Nickeson. *See* Tr. 421.

M.C. has no social activities and stays in the house 24 hours a day, 7 days a week. Tr. 37. He played baseball when he was younger, and the Little League accommodated him. Tr. 37. He tried to play the previous year, "but it didn't work out." Tr. 37.

M.C. testified as follows.

He experiences sharp pain in every joint. Tr. 38. It ranges from moderate to severe but is more often severe. Tr. 38. He feels "[t]errible" when he wakes up. Tr. 38. He takes medication first thing in the morning, and it takes an hour or two to reduce pain. Tr. 38. After taking medication, his pain is about a 5 on a scale of 1 to 10. Tr. 38. His medications cause tiredness, dizziness, lightheadedness, and upset stomach. Tr. 38. He can write only about a half page before he has wrist pain. Tr. 39. He does not spend time with friends outside the home. Tr. 39. About twice a month, he cannot get out of bed due to pain. Tr. 39. He can bathe himself but has problems putting on socks and shoes. Tr. 39. When he attended school, he experienced a lot of pain and had difficulty standing. Tr. 39. He had wrist and hand pain from writing. Tr. 39.

## IV. ALJ's Decision

At step one,[7] the ALJ found M.C. has never engaged in substantial gainful activity. Tr. 13.

At step two, the ALJ found M.C. suffers from severe impairments of Sjögren's syndrome, inflammatory arthritis, and asthma. Tr. 13.

[7]An ALJ must follow a three-step sequential process to determine if a minor is disabled. 20 C.F.R. § 416.924(a). The ALJ asks: (1) is the minor currently engaged in substantial gainful activity; (2) does he have a severe impairment or combination of impairments; and (3) does the impairment or combination of impairments meet, medically equal, or functionally equal the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.*

At step three, the ALJ found M.C. has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 13. The ALJ also found M.C. has no impairment or combination of impairments that functionally equals the severity of a listed impairment. Tr. 13. He found M.C. has less-than-marked limitations in moving about and manipulating objects and health and physical well-being and no limitation in acquiring and using information, attending and completing tasks, interacting and relating with others, or ability to care for himself. Tr. 18–23.

The ALJ considered the medical evidence, opinion evidence, and testimony. Tr. 14–23. The ALJ gave great weight to the opinions and findings of M.C.'s medical providers, stating:

> The record contains findings and/or opinions from treating and examining physicians that generally support the limitations reached in this decision. Of import, the findings and/or opinions of the claimant's treating and examining sources reflect a longitudinal perspective of the claimant's impairments and are supported by the medically acceptable clinical and diagnostic/laboratory techniques.

Tr. 17. He stated he found the opinions of the state-agency medical consultants

> generally persuasive and consistent with the evidence of record as a whole. The undersigned also notes that the State agency medical consultants are familiar with the [SSA's] disability listings and residual functional capacity regulations and policies and that they had the opportunity to review the medical evidence of record in order to offer professional opinions both in support [of] and against disability.

Tr. 17. He gave "some weight, but not controlling, or great, weight," to the opinions from the teachers, observing they are not acceptable medical sources but are other sources who may provide information about how M.C.'s impairments affect his functioning. Tr. 17. He gave no significant weight to Prather's statements, stating:

> Since is it is not clear whether the claimant's mother is medically trained to make exacting observations as to dates, frequencies, types[,] and degrees of medical signs and symptoms, or of the frequency or

> intensity of unusual moods or mannerisms, the accuracy of her statements is questionable. Moreover, by virtue of her relationship as the claimant's mother, this witness cannot be considered a disinterested third[-]party witness whose statements would not tend to be colored by affection for the claimant and a natural tendency to agree with the symptoms and limitations the claimant alleges. Most importantly, significant weight cannot be given to the witness's statements because they, like the claimant's, are simply not consistent with the preponderance of the opinions and observations by medical doctors in this case.

Tr. 17–18.

Based on those findings, the ALJ found no disability. Tr. 23.

## V. Standard of Review

A court's review of an ALJ's decision is limited to determining whether the ALJ applied the correct legal standards and whether substantial evidence supports his findings. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). Substantial evidence is "less than a preponderance"; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* The court may not decide facts anew, reweigh evidence, make credibility determinations, or substitute its judgment for the Commissioner's judgment. *Id.*

## VI. Analysis

### *A. Whether Substantial Evidence Supports the ALJ's Finding M.C.'s Impairments Do Not Functionally Equal the Severity of the Listings*

Prather argues substantial evidence does not support the ALJ's finding that M.C.'s impairments do not functionally equal the severity of the listings. Doc. 24 at 10–14. She specifically challenges the ALJ's findings that M.C. has no limitation in attending and completing tasks and less-than-marked limitations in moving about and manipulating objects and health and physical well-being, arguing the ALJ failed to properly consider Ms. Noblitt's and the ESE department head's opinions in the

questionnaires. Doc. 24 at 12–14. The Commissioner responds substantial evidence supports the ALJ's findings and decision to give only some weight to those opinions. Doc. 25 at 4–9.

At step three, an ALJ must determine whether a minor claimant's impairments meet, medically equal, or functionally equal the listings. 20 C.F.R. § 416.924(a). In determining functional equivalency, an ALJ assesses the "degree to which the [claimant's] limitations interfere with the [claimant's] normal life activities." *Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1279 (11th Cir. 2004). The ALJ must consider six "major domains of life": (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for oneself, and (6) health and physical well-being. *Id.*; 20 C.F.R. § 416.926a(b)(1). An impairment functionally equals the listings if it causes marked limitations in two domains or an extreme limitation in one domain. *Shinn*, 391 F.3d at 1279; 20 C.F.R. § 416.926a(d).

A minor claimant has a marked limitation when his "impairment(s) interferes seriously with [his] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). "'Marked' limitation also means a limitation that is 'more than moderate' but 'less than extreme.'" *Id.* With respect to the domain of health and physical well-being, a claimant has a marked limitation if he is "frequently ill because of [his] impairment(s) or ha[s] frequent exacerbations of [his] impairment(s) that result in significant, documented symptoms or signs." 20 C.F.R. § 416.926a(e)(2)(iv).[8]

[8]Section 416.926a(e)(2) also states the SSA considers a minor to have a marked limitation (1) if he is under 3, has "no standard scores from standardized tests in [his] case record," and functions "at a level that is more than one-half but less than two-thirds of [his] chronological age"; or (2) if he has "a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and [his] day-to-day functioning in domain-related activities is consistent with that score." 20 C.F.R. § 416.926a(e)(2)(ii)–(iii).

A minor claimant has an extreme limitation when his "impairment(s) interferes very seriously with [his] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). "'Extreme' limitation also means a limitation that is 'more than marked.' 'Extreme' limitation is the rating [the SSA] give[s] to the worst limitations. However, 'extreme limitation' does not necessarily mean a total lack or loss of ability to function." *Id.* Regarding the domain of health and physical well-being, a claimant has an extreme limitation if he is

> frequently ill because of [his] impairment(s) or ha[s] frequent exacerbations of [his] impairment(s) that result in significant, documented symptoms or signs substantially in excess of the requirements for showing a "marked" limitation. However, if [he] ha[s] episodes of illness or exacerbations of [his] impairment(s) that [the SSA] would rate as "extreme" under this definition, [his] impairment(s) should meet or medically equal the requirements of a listing in most cases.

20 C.F.R. § 416.926a(e)(3)(iv).[9]

Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939 (Aug. 9, 2006), "clarifies how [the SSA] considers opinions and other evidence from … 'non-medical sources,' such as teachers, school counselors, social workers, and others who have seen the individual in their professional capacity." SSR 06-03p, 2006 WL 2329939, at *4. It states evidence from other sources may "provide insight into the severity of the impairment(s) and how it affects [an] individual's ability to function." *Id.* at *2. It states the SSA should evaluate opinions from non-medical sources by considering factors such as how long the source has known the claimant, how frequently she sees him, how consistent the opinion is with other evidence, the degree to which the source

[9]Section 416.926a(e)(3) also states the SSA considers a minor to have an extreme limitation (1) if he is under 3, has "no standard scores from standardized tests in [his] case record," and functions "at a level that is one-half of [his] chronological age or less"; or (2) if he has "a valid score that is three standard deviations or more below the mean on a comprehensive standardized test designed to measure ability or functioning in that domain, and [his] day-to-day functioning in domain-related activities is consistent with that score." 20 C.F.R. § 416.926a(e)(3)(ii)–(iii).

presents evidence to support her opinions, how well she explains her opinion, whether she has a specialization or area of expertise related to the claimant's impairments, and any other relevant factor. *Id.* at *4–5. "[T]he adjudicator generally should explain the weight given to the opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." *Id.* at *6. An ALJ's determination on an issue may be implicit, but the "implication must be obvious to the reviewing court." *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir .1983).

In finding M.C. has a less-than-marked limitation in health and physical well-being, the ALJ observed treatment records showed M.C. received conservative treatment with medication for Sjögren's syndrome and arthritis. Tr. 23. He observed joint pain and stiffness, especially in the morning, was reasonable given those diagnoses. Tr. 23. The ALJ emphasized that, in December 2013, M.C. had reported his energy level was good, he had been playing baseball and had lost 15 pounds because of increased activity, there was no evidence of active arthritis on examination, and Dr. Nickeson observed his arthritis was under good control. Tr. 23. In finding M.C. has less-than-marked limitations in moving about and manipulating objects, the ALJ observed his teachers had reported difficulties with writing, standing, walking, and performing postural activities. Tr. 21. In finding M.C. has no limitation in attending and completing tasks, the ALJ found, "The evidence of record as a whole indicates that the claimant's functioning in this domain is age appropriate." Tr. 19.

Substantial evidence supports the ALJ's findings. Considered collectively, the medical records show M.C. developed joint pain from arthritis, which he first reported in April 2011 and which gradually worsened. Dr. Nickeson tried different medication combinations until M.C. responded to treatment with methotrexate and prednisone. With medication, M.C. had more energy and less pain, could participate in sports, and had good control of arthritis symptoms. His pain worsened when he stopped receiving methotrexate injections but improved when he resumed. He reported no nausea from

the medication. Although the record contains evidence M.C. increasingly relied on homebound education because of pain and had difficulty writing for extended periods and completing assignments, substantial evidence supports the ALJ's conclusion that his impairments caused less-than-marked limitations in health and physical well-being and moving about and manipulating objects and no limitation in attending and completing tasks based on his documented improvement while on medication. None of the evidence Prather cites requires finding M.C. experienced "more than moderate" limitations in any of those areas. *See* 20 C.F.R. § 416.926a(e)(2)(i) (describing a marked limitation as "'more than moderate' but 'less than extreme.'").

Prather argues the ALJ erred in evaluating the teachers' opinions because (1) they saw him more frequently than his doctors did and (2) the ALJ's rejection of their opinions solely because they were not acceptable medical sources was contrary to SSR 06-03p. Doc. 24 at 12–14. Although the teachers identified significant limitations in most domains, the ALJ gave their opinions only some weight because they are not acceptable medical sources. Tr. 17. By contrast, he gave the findings and opinions of treating and examining physicians great weight. Tr. 17. In doing so, he implicitly found the medical opinions—which he observed "reflect[ed] a longitudinal perspective of [M.C.]'s impairments and [we]re supported by the medically acceptable clinical and diagnostic/laboratory techniques," Tr. 17—provided a more accurate picture of M.C.'s functioning than the opinions of his teachers. Substantial evidence supports the ALJ's decision to give more weight to the medical opinions than their opinions. That Ms. Correia and Ms. Noblitt saw M.C. more frequently[10] could have been a reason to give their opinions more weight, but the ALJ did not commit reversible error in choosing to give more weight to the medical opinions instead. That evidence—showing consistent improvement, good arthritis control, and increased activity after

[10]Prather argues M.C.'s teachers saw him "on almost a daily basis," *see* Doc. 24 at 12, but the ESE department head did not indicate how frequently she saw him or whether she taught him, *see* Tr. 264–71.

introduction of methotrexate—conflicts with the teachers' opinions, provided just a few months later.

Because substantial evidence supports the ALJ's finding that M.C.'s impairments do not functionally equal the severity of the listings, reversal and remand for reconsideration of the evidence are unwarranted.

### *B. Whether the ALJ Properly Considered Prather's Testimony*

Prather argues the ALJ improperly evaluated her testimony because he relied on her partiality and lack of medical training—factors that "would render all testimony, from all parents, in all child SSI claims unreliable." Doc. 24 at 14–15. She argues that, in relying on those factors, he did not comply with the Eleventh Circuit's decision in *Shinn* because he effectively ignored her testimony. Doc. 24 at 14–15. The Commissioner responds the ALJ properly evaluated Prather's testimony. Doc. 25 at 4–5, 8–9.

As discussed, evidence from non-medical sources, such as relatives, is relevant in determining the severity of a claimant's impairments and how they affect his ability to function. SSR 06-03p, 2006 WL 2329939, at *2.

The ALJ did not err in relying on Prather's perceived partiality and lack of medical training. SSR 06-03p states an evaluator should consider several factors, including whether a non-medical source has a specialization or area of expertise related to the claimant's impairments. SSR 06-03p, 2006 WL 2329939, at *4. That the record does not indicate Prather has medical training supports the ALJ's finding her ability to objectively and reliably observe the severity and frequency of M.C.'s symptoms is "questionable." And her natural tendency to believe her son's subjective complaints is a relevant factor in considering the weight to give her statements, particularly because her statements conflicted with medical evidence. Prather fails to mention what the ALJ considered to be the "[m]ost important[ ]" factor in declining to give significant weight to her statements: their inconsistency with the medical

evidence as a whole. That evidence—showing significant improvement with medication—undermines her statements about the severity of M.C.'s impairments and their effect on his functioning. For example, she testified methotrexate frequently causes nausea several days a week, *see* Tr. 35, but Dr. Nickeson observed in December 2013 that M.C. had not complained of nausea, *see* Tr. 415. Prather also testified M.C.'s condition seemed to stay the same or worsen, *see* Tr. 35, but Dr. Nickeson's treatment notes show improvement after introduction of methotrexate, *see* Tr. 415, 417–19.

*Shinn* is distinguishable. There, the ALJ, without explanation, "failed to consider any of the testimony of [the claimant]'s mother." *See Shinn*, 391 F.3d at 1280. Here, the ALJ considered Prather's statements and declined to give them significant weight for reasons both legally sufficient and supported by substantial evidence.

Because the ALJ properly evaluated and considered Prather's statements, reversal and remand for reconsideration of them are unwarranted.

### *C. Whether the ALJ Properly Considered M.C.'s Subjective Complaints*

Prather argues the ALJ erred in evaluating M.C.'s subjective complaints of pain, observing the diagnoses of juvenile rheumatoid arthritis, Sjögren's syndrome, and obesity "would have the very symptoms [M.C.] testified to[:] severe joint pain, which can wax and wane." Doc. 24 at 16. She argues Dr. Nickeson's recommendation of homebound schooling[11] and treatment of M.C.'s pain support his complaints. Doc. 24 at 16. She argues the ALJ summarized only the medical evidence supporting his decision and failed to discuss other more serious evidence. Doc. 24 at 16. The

[11]Prather cites a February 2012 form to support the assertion that Dr. Nickeson recommended homebound schooling. *See* Doc. 24 at 8 (citing Tr. 182). The form does not contain Dr. Nickeson's name or signature; instead, it shows a registered nurse completed the form. Tr. 182. Prather testified Dr. Nickeson made the recommendation, *see* Tr. 36, but none of Dr. Nickeson's treatment records indicate he ever recommended homebound schooling. *See* Tr. 286–93, 414–36.

Commissioner responds the ALJ properly evaluated M.C.'s subjective complaints. Doc. 25 at 4–7.

In evaluating a claimant's subjective complaints of pain or other symptoms, an ALJ must determine whether there is an underlying medical condition and either (1) objective medical evidence confirming the severity of the alleged symptom arising from that condition or (2) evidence the condition is so severe that it can be reasonably expected to cause the alleged symptom. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). If the objective medical evidence does not confirm the alleged severity of a claimant's symptom, but an impairment can be reasonably expected to cause that alleged severity, an ALJ must evaluate the intensity and persistence of his alleged symptoms and their effect on his ability to work. 20 C.F.R. § 416.929(c)(1). In doing so, an ALJ must consider all available evidence, including objective medical evidence and statements from the claimant and others. 20 C.F.R. § 416.929(c)(2)–(3). An ALJ also must consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence." 20 C.F.R. § 416.929(c)(4).

If an ALJ discredits a claimant's testimony about the intensity, persistence, and limiting effects of a symptom, such as pain, he must provide "explicit and adequate reasons for doing so." *Holt*, 921 F.2d at 1223. "A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995). A reviewing court should ask not whether the ALJ could have reasonably credited a claimant's testimony, but whether the ALJ had been clearly wrong in discrediting it. *Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

An ALJ must consider all relevant record evidence in making a disability determination. 20 C.F.R. § 416.920(a)(3). But "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision … is not a broad rejection which is not enough to enable [the Court] to

conclude that [the ALJ] considered [the claimant's] medical condition as a whole." *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (internal quotation marks omitted). "Even if the evidence preponderates against the … factual findings, we must affirm if the decision reached is supported by substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).

The ALJ provided explicit and adequate reasons, supported by substantial evidence, for not fully crediting M.C.'s subjective statements. He found M.C.'s impairments "could reasonably be expected to produce some of the alleged symptoms; however, the statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible for the reasons explained below." Tr. 15. He then discussed M.C.'s treatment, beginning in April 2011, for arthritis and Sjögren's syndrome. Tr. 15–17. He observed M.C. reported joint pain on several occasions but also associated some of the increased pain with increased activity in sports. He observed Dr. Nickeson managed M.C.'s arthritis medications and that, with introduction of methotrexate, M.C. was more active and had good control of arthritis symptoms. He found M.C.'s statements, like Prather's, were "simply not consistent with the preponderance of the opinions and observations by medical doctors." Tr. 18. As discussed, the medical evidence supports those findings.

To the extent Prather argues M.C.'s diagnosed impairments would cause the symptoms about which he complained, the ALJ concluded M.C.'s impairments could reasonably be expected to cause the reported symptoms. Tr. 15. He rejected not the existence of the symptoms but M.C.'s report of their severity. *See* Tr. 15. And M.C.'s participation in homebound schooling, although providing evidence that his pain affected his functioning, does not change that substantial evidence supports the ALJ's finding that M.C.'s complaints were not entirely credible. *See Martin*, 894 F.2d at 1529 ("Even if the evidence preponderates against the … factual findings, we must affirm if the decision reached is supported by substantial evidence."). M.C.'s participation in baseball and increased activity after attaining good control of

arthritis symptoms with medication conflict with his asserted inability to attend school due to pain during the same time period. Prather fails to point to evidence the ALJ ignored to support her assertion he mentioned only evidence supporting his decision. The ALJ accurately summarized much of the evidence Prather describes in her brief.

Because the ALJ properly evaluated and considered M.C.'s subjective complaints, reversal and remand to reevaluate those complaints are unwarranted.

## VII. Conclusion

The Court **affirms** the Commissioner's decision and directs the clerk to enter judgment in favor of the Commissioner and close the file.

**Ordered** in Jacksonville, Florida, on March 31, 2017.

PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c: Counsel of record